United States District Court
Southern District of Texas
**ENTERED**
March 03, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PENNY JACOBSON-BOETTCHER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-853 |
| | § | |
| SERGEANT WILLIAM DOWDY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are two Motions for Summary Judgment, one filed by Defendants William Dowdy ("Dowdy") and Jacob Walker ("Walker") (Dkt. 47) and one filed by Defendant Harris County ("Harris County"). (Dkt. 49) After carefully reviewing the motions, responses, replies, applicable law, and the entire summary judgment record, both motions are **GRANTED.**

### I.   FACTUAL BACKGROUND

In light of the summary judgment standard, which will be discussed below, the following facts are established by the summary judgment record. In the early morning hours of October 23, 2016, Plaintiff Penny Jacobson-Boettcher ("Jacobson-Boettcher") and her husband, Isaiah Boettcher ("Boettcher") (collectively "Boettchers") were at Mo's Place Bar in Katy, Texas. (Dkt. 54-A at p. 2) Jacobson-Boettcher bumped another patron near the dance floor who complained about her to the bar's management. At that point, Jacobson-Boettcher was asked to leave the bar, first by Richard Steele, a bouncer employed by the bar, and then by Deputy Mook ("Mook"), an off-duty Harris County

Sherriff's deputy in uniform who was working security at the bar. According to Jacobson-Boettcher, the Boettchers walked outside the bar with Steele and Mook and waited for the manager of the bar, Mo Jr., to bring them their tab. (Dkt. 54-A at pp. 2–3)

As Jacobson-Boettcher walked outside, she asked Steele and Mook multiple times why she had to leave since she had done nothing wrong. Jacobson-Boettcher specifically testified that she told Mook something to the effect of "This is bullshit. I didn't do anything wrong." (Dkt. 47-1 at 129: 11–20) Mo Jr. testified that after he came outside, he told Boettcher that Jacobson-Boettcher needed to call it a night and go home as he believed that she had had too much to drink and that if she had another drink "she might be a danger to herself and others." (Dkt. 47-4 at 57:17–24) Mo Jr. testified that Mr. Boettcher agreed with him, but Jacobson-Boettcher thought she was "totally sober and fine."[1] (Dkt. 47-4 at 58:10–13) Jacobson-Boettcher then got into a discussion with Mook in which she accused Mook of having raped her about 20 years ago. (Dkt. 47-1 at 101:5–102:4)

At the time nearby, Defendant Sergeant William Dowdy ("Dowdy"), another off-duty Harris County Sherriff's deputy in uniform who was working security at the bar, heard this discussion and walked over to the group. Dowdy testified that what first drew his attention to Jacobson-Boettcher "was her level of intoxication, the way she was acting

---

[1] Mo Jr. testified, "I said -- I even pulled [Mr. Boettcher] to the side and was like, 'Dude, man, your wife is going to get in trouble. You know, she keeps running her mouth and cursing at the police officers and doing this and flailing her arms around. She looks like she's about to hit them. She's going to get put in a pair of handcuffs.' I was like, 'Be the man of the relationship and just get her out of here.' He's like, 'Easy for you to say. I've tried that before. She'll beat me up when I get home if I try to do anything. I have to take her side no matter what. You know, my marriage will be tarnished.' I was like, 'Whatever.'" (Dkt. 47-4 at 62:8–20)

and the things she was talking about." (Dkt. 47-5 at 28:6–8) He testified that she was acting erratically, "flailing her arms towards [Mook]" and screaming, "hollering" and "yelling" at Mook with "a lot of profanity." (Dkt. 47-5 at 28:10–14, 29:3–6) Dowdy described Jacobson-Boettcher as appearing "disheveled" with "bloodshot eyes." Her speech was "slow and slurred, she was not listening to anything anybody was having to say other than what she" had to say. (Dkt. 47-5 at 29:16–22) Dowdy testified that his request to Jacobson-Boettcher to "calm down" was met by more profanity laced language, "you know, it was 'fuck you', basically." (Dkt. 47-5 at 29:3–6) While she first told Dowdy that Mook raped her, she later implied that Dowdy has also raped her. (Dkt. 47-5 at 39:4–11) Dowdy said that she was starting to draw a crowd and becoming disorderly in a public place while intoxicated. (Dkt. 47-5 at 29:9–14)

Dowdy testified that Boettcher "deescalated" the encounter by telling Mook and Dowdy that they would leave. (Dkt. 47-5 at 32:12–15) The Boettchers settled their bill and Boettcher left to get the truck from the parking lot. Jacobson-Boettcher did not go with him and waited for his return. She testified that because of her medical condition of rheumatoid arthritis and "raw" feet she could not walk all the way to where the truck was parked. (Dkt. 47-1 at 104:24–105:5) Dowdy considered the encounter over and walked away. (Dkt. 47-5 at 32:12–15)

Jacobson-Boettcher testified that when her husband arrived, she and Mook were still "exchanging words." (Dkt. 54-1 at p. 4) Dowdy testified that he was walking outside the bar when he saw Jacobson-Boettcher screaming at her husband as he tried to get her into the truck. Dowdy testified that she "was very agitated, very distraught." Dowdy

approached them and told her to get into the truck or she was going to jail. (Dkt. 47-5 at 35:12–18, 43:21–44:2) Dowdy also testified that as Jacobson-Boettcher was about to get into the truck, she turned around just two feet away from Dowdy. She put her hands together like they were handcuffed, thrust them in Dowdy's face, barely missing hitting him, and said "Arrest me motherfucker." (Dkt. 47-5 at 35:12–23) She was then handcuffed by Dowdy.[2] After she was handcuffed Jacobson-Boettcher informed Dowdy of several medical issues including rheumatoid arthritis, neck issues, and that her "feet were raw." (Dkt. 54-1 at p. 5)

Dowdy then started to lead Jacobson-Boettcher to his patrol car as Mr. Boettcher followed them. Dowdy testified that because Jacobson-Boettcher's balance was unsteady, he asked her to sit on the curb so she could "maintain her balance, not fall." (Dkt. 47-5 at 39:4–11) Dowdy testified that Jacobson-Boettcher refused to sit down and screamed, "Fuck you, I'm not getting on the ground so you and him can rape me again." She began pointing to Mook and screaming "he raped me, he raped me." (Dkt. 47-5 at 39:9–15) Dowdy testified that Jacobson-Boettcher was "very, very unsteady on her feet and not able to maintain her own balance." Dowdy testified that he was trying to maintain control of the handcuffs when she fell forward into the trash can knocking the lid off but not falling on to the ground. According to Dowdy, he then held her against the trash and used his arm to brace her on top of the trash can so she could not wiggle away and possibly fall. (Dkt. 47-5 at 40:2–14) Dowdy testified that Jacobson-Boettcher was "very

---

[2] Dowdy testified that he asked Boettcher "Why couldn't you help us get her in the vehicle and just leave?" and that Boettcher responded, "Honestly, sir, if I were to put her in the vehicle, you would probably be taking us both to jail." (Dkt. 47-5 at 37:13–16)

flamboyant yelling and screaming at everybody." As Dowdy called for back up to assist him, Jacobson-Boettcher attempted to wander off while in handcuffs. Dowdy testified that she then broke free from his grip on the handcuffs and fell and hit the pavement. (Dkt. 47-5 at 41:3–42:11) Jacobson-Boettcher testified that she lost consciousness for maybe one or two minutes after the fall. (Dkt. 47-1 at 150:19–22) Dowdy testified that as he was trying to get her to her feet, there were many people in their immediate vicinity and deputies began responding to a fight going on in the same parking lot. (Dkt. 47-5 at 45:15–18)

Defendant Walker, a Harris County Sheriff's deputy who had been on patrol on the night of the incident received a call for assistance and arrived on the scene. As Dowdy and Walker lifted Jacobson-Boettcher up and started to move her to the patrol car, she became "dead weight" in their arms. (Dkt. 47-5 at 46:15–20) As they led her to the car, Jacobson-Boettcher continued to scream and resist their attempt to move her. On the way to the car, Jacobson-Boettcher tripped over her feet, falling to the ground and pulling the deputies to the ground with her in the middle of a driving lane in the parking lot. All three were injured in the fall. Walker was eventually able to drag Jacobson-Boettcher out of the driving lane and into the patrol car.

Once in the car Jacobson-Boettcher kicked the car door, refused to pull her legs in and had to be pulled from the opposite door into the patrol car. Jacobson-Boettcher began to beat her head against the car window and vomited in the back seat of the patrol car.

When an ambulance came to take Jacobson-Boettcher to the hospital, the emergency medical technicians believed her to be intoxicated and noted that she was

5 / 18

belligerent and smelled of alcohol. Jacobson-Boettcher cursed and swore at the emergency medical technicians who tried to help her. She called the female technician a "bitch," threw her arms around, used the word "fuck" and "yelled a lot." (Dkt. 47-2 at para. 8) She also was uncooperative with EMS, pulled off the blood pressure cuff, and initially refused medical treatment. (Dkt. 47-2 at paras. 6, 11)

When the ambulance arrived at the hospital, Jacobson-Boettcher refused treatment so that she could take pictures of her injuries, returned home, and then went back to the hospital for treatment. As a result of the incident, Jacobson-Boettcher claims to have experienced numerous physical and mental damages including bruises, nerve injury, memory loss, tendonitis, PTSD, depression, and insomnia. (Dkt. 54 at p. 11)

Jacobson-Boettcher testified that that at no time did she "swing, flail, run, trip" or "refuse" orders by any officer. She also denied being drunk or that she was arguing with anyone at the time she was being arrested. (Dkt. 54-1 at p. 5) Other than admitting to using what she described as "a bad word"—"bullshit"—to Mook, she denies having used profanity during her arrest. (Dkt. 47-1 at 129:11–16) Jacobson-Boettcher states that due to her health issues, she did not have "the physical prowess, strength or any thought" to resist arrest. (Dkt. 54-1 at p. 6) Jacobson-Boettcher asserts that the civilian eyewitnesses to her arrest and the sheriff deputies on the scene—including Dowdy and Walker— who have testified to the contrary are "liars." She asserts at the time she was being taken to the patrol car she was having flashbacks to her alleged rape and this was the cause of her

actions in the patrol car.³ Jacobson-Boettcher testified that she was "unintentionally rude, irritable and agitated" towards the EMS personnel, which she attributes to medical shock from what she had just experienced. (Dkt. 54-1 at p. 9)

Subsequently Jacobson-Boettcher filed this lawsuit under 43 U.S.C. § 1983 alleging that Dowdy and Walker violated her rights under the Fourth Amendment to the United States Constitution by using excessive force during her arrest and unlawfully arresting her.

In the pending motions, Dowdy and Walker move for summary judgment contending that Jacobson-Boettcher's claims against them are barred by qualified immunity; Harris County has moved for summary judgment on the grounds that no violation of Jacobson-Boettcher's rights has occurred and that Jacobson-Boettcher has failed to identify and prove that any policy, practice, or custom of Harris County caused a deprivation of her rights.⁴ The Court will address these arguments below.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

---

³ The summary judgment record establishes that Jacobson-Boettcher has a documented history of emotional and mental health issues. She has been treated for depression and has been diagnosed with PTSD. (Dkt. 47-1 at 30:14–32:15)

⁴ Jacobson-Boettcher concedes that she does not have adequate evidence to prove her municipal liability claims against Harris County and does not oppose Harris County's motion for summary judgment. (Dkt. 55)

317, 322–24 (1986). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). A fact is material if "its resolution could affect the outcome of the action." *Nunley v. City of Waco*, 440 F. App'x 275, 277 (5th Cir. 2011). The court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). If the movant produces evidence that tends to show that there is no dispute of material fact, the nonmovant must then identify evidence in the record sufficient to establish the dispute of material fact for trial. *Celotex*, 477 U.S. at 321–23.

The nonmovant must "go beyond the pleadings and by her own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001) (citing *Celotex*, 477 U.S. at 324). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertion, or by only a scintilla of evidence.'" *Jurach v.*

*Safety Vision, L.L.C.*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). Likewise, a party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *Smith v. Sw. Bell Tel. Co.*, 456 Fed. App'x 489, 492 (5th Cir. 2012) ("[W]e have repeatedly held that self-serving statements, without more, will not defeat a motion for summary judgment, particularly one supported by plentiful contrary evidence."); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion.)

B. **Qualified Immunity**

The doctrine of qualified immunity protects government officers from civil liability in their individual capacities if their conduct does not violate clearly established federal statutory or constitutional law of which a reasonable person would have known. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Once raised as a defense, the plaintiff has the burden to demonstrate that qualified immunity should be pierced. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). This inquiry requires a two-part analysis, in which the court determines (1) whether the official violated a statutory or constitutional right, and (2) whether the unlawfulness of the official's conduct was "clearly established" at that time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589

(2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). A right is "clearly established" only where pre-existing law "dictate[s], that is truly compel[s] (not just suggest[s] or allow[s] or raise[s] a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in these circumstances." *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012). Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity unless "all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights." *Carroll v. Ellington*, 800 F. 3d 154, 169 (5th Cir. 2015). In the context of a summary judgment motion like the one here, to avoid summary judgment on the officers' claim of qualified immunity, the plaintiff must demonstrate that there is a genuine issue of material fact regarding whether a constitutional violation took place and must show that under clearly established law provided that the officer's conduct was objectively unreasonable. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir. 2007).

    C.    **Municipal Liability Under 42 U.S.C. § 1983**

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). A local government may not be sued under Section 1983 for the deprivation of rights guaranteed by the Constitution or federal law inflicted solely by its employees or agents. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory.") However, "when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," the government agency is liable under Section 1983. *Id*.

To state a claim against a municipality under Section 1983, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

> "An official policy is either (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."

*McIntosh v. Smith*, 690 F. Supp. 2d 515, 530 (S.D. Tex. Feb. 2, 2010) (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

A local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights can only be considered an official government policy where the failure to train amounts to "deliberate indifference" to the rights of persons with whom the employee comes into contact. *Connick v. Thompson*, 563 U.S. 51 (2011) "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997).

### III. ANALYSIS

#### A. Dowdy and Walker Are Entitled to Qualified Immunity Regarding the Excessive Use of Force Claim

The Fourth Amendment guarantees the right to be free from excessive force during an arrest. Under the first prong of the qualified immunity analysis, to establish a claim for violation of the Fourth Amendment's prohibition on excessive force, Jacobson-Boettcher must show (1) she suffered an injury that (2) "resulted directly and only from a use of force that was clearly excessive to the need," (3) the excessiveness of the force was objectively unreasonable. *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (internal quotation marks and citations omitted).

Here, Jacobson-Boettcher has failed to establish a claim against Dowdy and Walker for use of excessive force. "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The court must evaluate the use of force by these officers "from the perspective of a reasonable officer on the scene," and not "with the 20/20 vision of hindsight." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). In *Graham v. Connor*, the Supreme Court identified three factors—the "*Graham* factors"—that courts should consider when assessing whether a particular use of force was reasonable: (1) the severity of the crime at hand, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. 490 U.S. at 389.

Considering the summary judgment evidence in the instant case under the *Graham* factors, the Court finds that a jury could not reasonably conclude that the force used against Jacobson-Boettcher was excessive and thus constituted a violation of her constitutional rights. Assuming that the first *Graham* factor might weigh against the immediate use of force in Jacobson-Boettcher's arrest, here once she was under arrest the other two factors clearly and overwhelmingly establish that Dowdy and Walker are immune from this lawsuit. Under the second *Graham* factor, the summary judgment evidence establishes that Jacobson-Boettcher's conduct not only posed an immediate threat to the safety of the officers and bystanders, but that she actually caused the officers harm by actively resisting arrest and pulling them to the ground by dropping in their arms as "dead weight" while they attempted to bring her to the patrol car. Next, under the third *Graham* factor, the summary judgment evidence establishes that no reasonable jury could find that the force used was excessive to the need.

Here, the summary judgment evidence corroborates the testimony of Dowdy and Walker regarding the material facts supporting the reasonableness of the force used to bring Jacobson-Boettcher to the patrol car when she was injured. The statements and testimony of the civilian eyewitnesses including two bar patrons, one of whom videotaped part of the encounter, Mo Jr. and medical technicians, as well as hospital intake records and limited videotape of the incident establish that Jacobson-Boettcher 1) was extremely intoxicated; 2) was combative, even flailing her arms at officers and bystanders until she was handcuffed; 3) was acting erratically by cursing, yelling and

screaming at those around her; 4) tried to get away from Dowdy even while handcuffed and after Dowdy had allegedly placed a firmer grip on her; 5) despite her medical conditions and alleged inability to resist, succeeded in getting away for Dowdy's grip before Walker came to assist him; 6) fell not once but twice while she was either attempting to get away from the officers or prevent them from moving her; and 7) Dowdy and Walker were injured as a result of her second fall. The summary judgment record also establishes the urgency of the need to move Jacobson-Boettcher out of the area as quickly as possible because of the developing fight nearby in the parking lot and the need for the officers to come to the assistance of the deputies involved in stopping that fight.

The Court finds that Jacobson-Boettcher's self-serving deposition and affidavit testimony contradicting these facts—which are completely unsubstantiated by any other evidence in the summary judgment record—are insufficient to create a material issue of fact as to the reasonableness of the force used against her by Dowdy and Walker.[5] The Court is not required to accept as true a nonmovant's conclusory allegations, speculation, or unsubstantiated assertions of fact that are either entirely unsupported by the summary judgment record, or are supported by a mere scintilla of evidence. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413 (5th Cir. 2003). A nonmovant's self-serving and unsupported testimony will not defeat summary judgment where the evidence in the

---

[5] For these same reasons, the Court also finds Boettcher's self-serving and conclusory affidavit testimony—including but not limited to statements that everyone who does not agree with his wife's version of events is a "liar" is not competent summary judgment evidence and the Court will not accept these statements as true for purposes of ruling on the pending motion.

record is to the contrary. *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citing *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995)).

Here, the Court will not accept as true Jacobson-Boettcher's unsubstantiated and conclusory statements regarding her conduct for purposes of ruling on the pending summary judgment motion. The Court also finds that even if Jacobson-Boettcher had told Dowdy and Walker of her medical conditions after she was handcuffed as she claims, under the facts of this case, that knowledge would not make their use of force unreasonable. Accordingly, the Court finds that Dowdy and Walker did not violate Jacobson-Boettcher's constitutional rights and these defendants are entitled to qualified immunity as to Jacobson-Boettcher's excessive force claims.

### B. Dowdy and Walker Are Entitled to Qualified Immunity Regarding the False Arrest Claim

Whether a plaintiff has established a claim for false arrest and satisfied the first prong of the qualified immunity analysis turns on whether "a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the officer possessed." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). An officer violates the Fourth Amendment if an arrest is made without a proper arrest warrant or probable cause. *Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (citations omitted); *see also Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). Here, it is undisputed that Dowdy and Walker acted without the benefit of a

warrant. Thus, the Court's inquiry focuses on the existence of probable cause to support the arrest.

"Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000). "If there was probable cause for any of the charges made . . . then the arrest was supported by probable cause, and the claim for false arrest fails." *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995).

"An officer may conduct a warrantless arrest based on probable cause that an individual has committed even a minor offense, including misdemeanors." *Deville*, 567 F.3d at 165 (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Moreover, "evidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable cause to conduct the arrest because probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. Accordingly, an officer's own testimony regarding the occurrence of an arrestable violation can by itself support a finding of probable cause, even in the face of the plaintiff's denial of that violation. *Id.*

Here, Dowdy had probable cause to arrest Jacobson-Boettcher for public intoxication and for criminal trespass. Dowdy and Walker reasonably believed Jacobson-Boettcher to have been publicly intoxicated and their testimony on this fact is supported

by competent summary judgment evidence. Jacobson-Boettcher also admits that she had been asked to leave the bar by both Steele and Mook and that she was standing in front of the bar entrance arguing with them about why she had been asked to leave when she was arrested. (Dkt. 54-A at 2–3) These facts gave Dowdy probable cause to arrest Jacobson-Boettcher for either public intoxication or criminal trespass or both. Courts have consistently held that an "arrest does not violate the Fourth Amendment if the officer making the arrest has probable cause to arrest the defendant for any crime, regardless of whether the defendant can be lawfully arrested for the crime which the officer states or believes he is making the arrest." *U.S. v. Bain*, 135 F. App'x 695, 696 (5th Cir. 2005) (citing *Devenpeck v. Alford*, 543 U.S. 146 (2004)). Accordingly, the Court finds that Jacobson-Boettcher cannot establish a claim for false arrest and Dowdy and Walker are entitled to qualified immunity from this lawsuit.

### C. Jacobson-Boettcher's municipal liability claim against Harris County fails because she did not create a genuine issue of material fact regarding whether she suffered a constitutional violation.

There can be no municipal liability under Section 1983 unless the plaintiff suffered a constitutional violation. As discussed above, the Court finds that Dowdy and Walker did not violate Jacobson-Boettcher's constitutional rights. Furthermore Jacobson-Boettcher has not identified an official policy or custom that led to her alleged constitutional violation nor a policymaker with actual or constructive knowledge of that policy or custom. *See Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

Accordingly, there can be no municipal liability against Harris County, and it is entitled to judgment in this case as a matter of law.

IV. **CONCLUSION**

For the reasons discussed above, the motion for summary judgments are **GRANTED.**

SIGNED at Houston, Texas, this 3rd day of March, 2021.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE